WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Miser, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>Centurion of Arizona LLC, et al.,<br><br>        Defendants. | No. CV-22-01968-PHX-SMB<br><br>**ORDER** |

Plaintiff James Miser ("Chaplain Miser") was violently attacked by a prison inmate wielding a handcrafted shank while he was employed at Arizona State Prison Complex Florence ("ASPCF"). Chaplain Miser and his wife Shirley Miser's (collectively, "Plaintiffs") lawsuit followed. (*See* Doc. 7.) Pending before the Court is Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. 73). The parties fully briefed the Motion (Doc. 77 (Defendants' Response); Doc. 81 (Plaintiffs' Reply)). Having reviewed the parties' briefings and the applicable law, the Court will grant Plaintiffs' Motion in part.

**I.    BACKGROUND**

    **A. Factual**

The factual background of this case was described in the previous order granting Defendant Centurion of Arizona, LLC's ("Centurion") Motion to Dismiss. (*See* Doc. 31.) The Court expounds upon it here, with additions relevant to the pending Motion coming from the proposed Second Amended Complaint. (*See* Doc. 73 at 11–48; *see also* Doc. 32 (First Amended Complaint).)

1        In 2022, Chaplain Miser was employed by the Arizona Department of Corrections Rehabilitation and Reentry ("ADOCRR") as a chaplain at ASPCF. (Doc. 73 at 12.) On March 3, 2022, while Chaplain Miser was walking across the yard at ASPCF heading to a religious service, inmate Jonathan Read ("Inmate Read") attacked him with a prison shank made from a prison bed. (Doc. 73 at 24.) Inmate Read stabbed Chaplain Miser at least six times, suffering blows to his head, neck, and shoulders. (*Id.*) As Chaplain Miser attempted to evade the attack, he fell to the ground, breaking his femur. (*Id.*) The ADOCRR Office of the Inspector General investigated the attack and issued an Investigative Report. (*Id.*) Inmate Read told the investigators that he decided to stab Chaplain Miser at least two or three weeks in advance and stated he "knew what he was doing when he left his cell that day." (*Id.*) Inmate Read admitted he made the knife from his bed post and kept it for about two or three weeks prior to the attack. (*Id.* at 9.)

Plaintiffs allege that Defendants failed to evaluate and appreciate the severity of Inmate Reads mental health condition, which would have led to his assignment to more restrictive housing, thereby preventing the attack from ever happening. (*Id.* at 25.) This includes records detailing Inmate Read's history of mental health symptoms, diagnoses, and treatments from his prior incarceration in the Federal Bureau of Prisons ("FBP"). (*Id.*) The records show that, while Inmate Read was in FBP custody, he had a documented history of hearing unwelcomed voices from witches, warlocks, and satanists who he complained were reading his mind, controlling his thoughts, forcing his relationship with god, and practicing black magic. (*Id.*) The records list diagnoses for schizophrenia, psychosis, schizotypal personality disorder, schizoaffective disorder, antisocial personality disorder, and malingering. (*Id.* at 17–18.) Inmate Read was also prescribed various psychotropic medications, including antidepressants and antipsychotics. (*Id.*) While incarcerated, the records further indicate that FBP placed Read under "Secured Housing Status" to assess his mental health after he stabbed another inmate. (*Id.*)

Inmate Read was later transferred and booked into ADOCRR around October 14, 2020. (*Id.* at 12.) Between July 1, 2019 and October 1, 2022, ADOCRR maintained a

contract with Centurion in which Centurion was to provide and perform mental health services for ADOCRR inmates, including those housed at ASPCF like Inmate Read. (*Id.* at 12.) Inmates were reliant on these services for all mental health needs. (*Id.*) Under the contract, ADOCRR required Centurion to abide by its Mental Health Technical Manual (the "Manual"), which states that "ADOCRR mental services shall be provided by a Contractor to include the provision of mental health services for patients housed in any of the Arizona State Prison Complexes or private prison complexes." (*Id.* at 18.) The contract and the Manual made Centurion responsible for ensuring "that mental health services and status decisions such as [severe mental illness ("SMI")] status, mental health scores, and treatment planning are done in accordance with current policy." (*Id.* at 18–19.) The Manual also required Centurion to compete an initial mental health assessment for all inmates for classification, placement, and provisions of services purposes. (*Id.*) Centurion was further required to conduct the assessment for all prisoners within two days of their arrival and to see the inmates within fourteen days of their arrival at ADOCRR prisons. (*Id.*) Finally, under the contract and the Manual, Centurion and its employees or agents were required to obtain copies of inmate medical records, including mental health and psychiatric records. (*Id.* at 20.)

Based on the assessment, Centurion could assign inmates five different mental health scores. (*Id.* at 21.) The scores were assigned as follows:

1. Mental Health 1 ("MH-1") was for inmates with "no history of mental health issues or receiving mental health treatment."

2. Mental Health 2 ("MH-2") included inmates who had "received mental health treatment in the past but do not currently have any mental health needs, and have demonstrated behavioral and psychological stability for at least six (6) months."

3. Mental Health 3 ("MH-3") was assigned to inmates with "current mental health needs requiring outpatient treatment."

4. Mental Health 4 ("MH-4") was for inmates "admitted to a residential mental health program.

5. Mental Health ("MH-5") encompassed inmates "who are admitted to the inpatient treatment programs licensed by the Department of Health Services."

(*Id.* at 21–22.) Inmates categorized as MH-3 could be further assigned one of five subcodes listed A through E, e.g., MH-3A. (*Id.*) MH-3A inmates are "in acute distress who may require substantial intervention in order to remain stable," i.e., "floridly psychotic [or] delusional." (*Id.*) MH-3B through E were for inmates that "(B) are 'generally stable and participate in psychiatric and psychological services,' (C) 'need infrequent intervention and have adequate coping skills to manage their mental illness effectively and independently with psychotropic medications only'; (D) 'have been recently taken off of psychotropic medications,' and (E) 'recently arrived to ADOCRR, and who are generally stable but may benefit from regular contacts with a mental health clinician.'" (*Id.*)

        No Centurion employee or agent of Centurion had conducted a mental health assessment of Inmate Read until about nine months after his arrival. (*Id.* at 19–20.) Plaintiffs allege that the following individuals either inadequately evaluated or failed to review records of Inmate Read's prior mental health status. On July 26, 2021, about seven months before the attack and nine months after Inmate Read was booked into ADOCRR, Defendant Dawn Tuttle, a nurse, documented that he had no psychiatric history. (Doc. 73 at 25.)[1] The next day, on July 27, 2021, Defendant Lorryn Zephier, a staff member, completed Inmate Read's initial mental health assessment but documented that he had no history of mental health problems or violent behavior. (*Id.* at 19.) That same day, Defendant Diane Ortega, a Psychology Associate, documented seeing Inmate Read and reviewing available records but recorded that he had never received treatment for mental health issues, never hallucinated or had paranoia, and that he was not a danger to himself or others. (*Id.* at 25–26.) Also on July 27, Defendant Patricia Borden, another nurse, likewise documented that he had no history of mental health services "and was not SMI." (*Id.* at 26.) On August 3, 2021, Defendant Iheanyi Amanwanne, a mental health nurse, documented the same observations as Borden. (*Id.*) Two days later, in preparing transfer forms for Inmate Read, Amanwanne again documented he had no history of mental health

---

[1] Plaintiffs' proposed Second Amended Complaint appears to incorrectly list the year as 2001, but because it clarifies the time frame before the attack, the Court deduced 2021 is the correct year.

services nor psychiatric hospitalizations or treatment. (*Id.*) And Defendant Terry Kasimoff, another nurse, indicated he had no medical restrictions preventing him from being housed on the yard. (*Id.*) Lastly, on August 9, 2021, Defendant Janet Monroe, another staff member, prepared another transfer form indicating that Inmate Read had no history of mental health services and was not SMI. (*Id.*)

Plaintiffs further allege that the following circumstances should have provoked Centurion, or its employees or agents, to reclassify Inmate Read as at least MH-3 but failed to do so. (*Id.* at 27.) On September 12, 2021, Inmate Read sent a request for health services to Defendant Tanisha Buckner, another nurse, in which he detailed hearing satanists, witches, and warlocks making hateful remarks about his genitals and accessing his memories. (*Id.* at 29.) On November 11, 2021, Felicia Gaona ("Officer Gaona"), a correctional officer, reviewed one of Inmate Read's emails stating he should have "stuck a knife" in someone's neck regarding an issue with his commissary. (*Id.*) On November 18, 2021, Officer Gaona reviewed another of his emails where he discussed suffering from demonic possession and that no chaplain had commanded the demon out of his body. (*Id.*) Officer Gaona called Defendant Joni Delaney, a mental health care provider, to notify her of the November 18 email. (Doc. 73 at 29.) On December 4, 2021, Inmate Read emailed Officer Gaona again, stating that he was being demonized and talked about "a CIA agent that kills Satanists." (*Id.*) In response, on December 8, 2021, Officer Gaona emailed Inmate Read stating: "I AM CALLING PSYCH TO COME SEE YOU. AND SENDING TO CHAPLAIN." (*Id.*) Officer Gaona also forwarded Inmate Read's email to Delaney, who responded: "[Inmate] Read was a 'Mental Health' and has done this before" and "she would go see [Inmate Read]." (*Id.* (alterations in original).)

About three months before the attack, Delaney sat down with Inmate Read for a 42-minute counselling session on December 16, 2021. (Doc. 73 at 30.) Delaney's notes from the session indicate that Inmate Read reported he was hearing the warlock and witch, and that they were distorting his reality and putting unwelcomed thoughts in his head about his sexuality and young girls. (*Id.*) But he also indicated he could control the thoughts

1  through prayer and fasting and denied having a mental health history despite "the curse."
2  (*Id.*) Delaney noted that Inmate Read's thoughts "were coherent but delusional," and those
3  delusions "were religious and persecutory." (*Id.*) After that session, Delaney still
4  documented that Inmate Read had no history of mental health services or diagnoses, that
5  she did not observe evidence that he posed a risk of victimizing others, and that she had a
6  plan to follow up in thirty days. (*Id.* at 31.) On January 12, 2022, Inmate Read refused the
7  follow-up session with Delaney. (*Id.*)

8        Up to this point, and prior to the attack, Defendants had not changed Inmate Read's
9  classification from MH-1 to account for his schizophrenia or history of prison violence.
10 (*Id.* at 27.) Accordingly, Plaintiffs allege that all named Defendants knew or should have
11 known of Inmate Read's mental health diagnoses and serious medical needs prior to the
12 attack. (*Id.* at 23.)

13       For the events occurring after the attack, Plaintiffs allege that within a few hours of
14 the attack, Ashley Bardwell, a Centurion employee, wrote that Centurion and its employees
15 had not seen the health services request that Inmate Read sent to Buckner prior, and stated
16 that these "are the types of misses that can have devastating consequences." (*Id.* at 32.)
17 Additionally, Bardwell's email was part of a chain that included a February 17, 2022 email
18 from Stephanie Opligner, another employee, stating Centurion was required to see inmates
19 who send those types of requests for mental health evaluations. (*Id.*) Only after the attack,
20 did Defendants reclassify Inmate Read as MH-3B. (*Id.*)

21       Plaintiffs blame Centurion's "miss" on its understaffing of health care providers for
22 all inmates, in which the available staff were inadequate to review mental health records,
23 respond to requests for services, provide timely and reasonable mental health services, and
24 react to potential threats. (*Id.* at 32–33.) Centurion's contract required them to staff 152
25 full-time employees at ASPCF, but in September 2021, Centurion had staffed only
26 ninety-seven fulltime employees that include medical, dental, mental health and
27 administration. *See Jensen v. Shinn*, No. CV-12-00601-PHX-ROS, 2022 WL 2911496,
28 at *6 (D. Ariz. June 30, 2022), *amended*, 2022 WL 2910835 (D. Ariz. July 18, 2022). In

*Jensen*, the district court determined Centurion's understaffing demonstrated "deliberate indifference" to the "substantial risk of serious harm to every prisoner." *Id.* at *60. Plaintiffs also assert that Centurion knew that it required fifteen percent more healthcare staff members than it had staffed to provide reasonable, safe, effective, and necessary mental healthcare services to all ADOCRR inmates. (Doc. 73 at 20.) Plaintiffs further allege that Centurion identified shortages of available nurses, assistants, mental health practitioners, and clinical coordinators as impairing its delivery of care to inmates. (*Id.*)

**B. Procedural**

Plaintiffs filed their initial Complaint in Arizona state court naming Defendants Centurion, "Doe" Delaney, and ten unidentified Centurion employees. (Doc. 7-1 at 6–8.) Plaintiffs asserted the Defendants violated 42 U.S.C. § 1983. (*Id.* at 16–17.) Plaintiffs also asserted a state law medical malpractice claim against Centurion and Delaney. (*Id.* at 18–19.) After removal to this Court, Centurion moved to dismiss the initial Complaint for failure to state a claim. (Doc. 10.) This Court granted Centurion's Motion, dismissing their medical malpractice claim with prejudice and dismissing Plaintiffs' § 1983 claim without prejudice with leave to amend. (*See* Doc. 31.)

Plaintiffs thereafter filed their First Amended Complaint, reasserting a single § 1983 claim against Centurion and Delaney. (Doc. 32.) Defendants were unable to admit or deny specific factual allegations regarding Inmate Read's medical history and treatment pursuant to 45 C.F.R. § 164.502. (Doc. 43 at 5–8.) Plaintiffs then moved under 45 C.F.R. § 164.512(e)(1)(i), (ii) for the release of the records. (Doc. 47) While that motion was pending, the parties filed a Rule 26(f) Joint Report detailing the issues with ascertaining the facts surrounding Inmate Read's mental health assessment under ADOCRR custody. (Doc. 49 at 4.) Plaintiffs indicated that they would conduct early written discovery on these issues and filed a Second Amended Compliant to reassert their § 1983 claim and include claims against Centurion and its employees for breach of a duty of care owed to Chaplain Miser. (*Id.*) The Joint Report also indicated that if Delaney was dismissed without prejudice at the early stages of litigation, Plaintiff may, to the extent warranted by

discovery, bring her back into the litigation under state and federal law theories of liability. (*Id.* at 4–5.) As the parties acknowledged in the Joint Report, the Court previously dismissed the medical malpractice claim because, at the time, Arizona law precluded finding Defendants owed a duty to Chaplain Miser and the Restatement could not form the basis for a common law duty as it inappropriately incorporated foreseeability into the inquiry. (*Id.* at 5.) On December 18, 2023, the Court granted Plaintiffs' Motion to Produce Inmate Medical records and set the deadline for them to file a Second Amended Complaint. (*See* Doc. 49; Doc. 50.)

The parties thereafter filed a Stipulation of Dismissal, dismissing Defendant Delaney without prejudice from the suit (Doc. 52), which the Court granted (Doc. 54). On March 1, 2024, Plaintiffs subsequently filed their Second Amended Complaint. (Doc. 57; *see also* Doc. 63.) The parties disagreed about whether Plaintiffs needed to request leave to amend to file the Second Amended Complaint. (*See* Doc. 67.) Following a status conference hearing, the Court struck the Second Amended Complaint, setting June 3, 2024 as the deadline for Plaintiffs to file a motion for leave to amend. (Doc. 71.) Plaintiffs' timely filed the pending Motion for Leave to File Second Amended Complaint. (Doc. 73.) Plaintiffs' amendment seeks to add various named Defendants, including re-adding Delaney, and amending their § 1983 claim (Count I). (*Id.*) Plaintiffs seek to add claims against Centurion for *Monell* liability (Count II), failure to train and supervise (Count III), and negligence and vicarious liability (Count IV). Plaintiffs also seek to add a claim against all Defendants for negligent failure to warn (Count V), and a claim against Defendants Delaney, Zephier, Tuttle, Ortega, Borden, Amanwanne, Kasimoff, Monroe, and Buckner for healthcare malpractice (Count IV). (*Id.*)

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) requires that leave to amend be "freely give[n] when justice so requires." Leave to amend should not be denied unless "the proposed amendment either lacks merit or would not serve any purpose because to grant it would be futile in saving the plaintiff's suit." *Universal Mortg. Co. v. Prudential Ins. Co.*, 799 F.2d

458, 459 (9th Cir. 1986). Therefore, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (cleaned up).

## III. DISCUSSION

### A. 42 U.S.C. § 1983

Under the Fourteenth Amendment's Due Process Clause, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "As a general rule, members of the public have no constitutional right to sue [public] employees who fail to protect them against harm inflicted by third parties." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). There are two exceptions to this rule. The first occurs when the government "affirmatively places the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (citing *DeShaney*, 489 U.S. at 197) (internal quotation marks omitted). The second occurs where there is a special relationship between the plaintiff and the government. *Ketchum v. County of Alameda*, 811 F.2d 1243, 1247 (9th Cir. 1987).

The affirmative action exception, also known as the state-created danger theory, requires for an act to create an actual, particularized danger, *Kennedy*, 439 F.3d. at 1063, and that the injury to plaintiff was foreseeable, *Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003). A plaintiff must show there was "affirmative conduct on the part of the state in placing the plaintiff in danger" and that the state acted with "deliberate indifference" to a "known or obvious danger." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)). To determine whether there was an "affirmative action," courts look to whether the state actor "left the person in a situation that was more dangerous than the one in which they found him," *Munger*, 227

1  F.3d at 1086, or in a "worse position than that in which he would have been had the state
2  not acted at all," *Pauluk v. Savage*, 836 F.3d 1117, 1124 (9th Cir. 2016) (cleaned up).
3  Under this theory, the Ninth Circuit allows a claim to proceed when a state actor played a
4  significant role in creating the dangerous situation. *See, e.g.*, *Munger*, 227 F.3d at 1087.
5  Still, "[a] state actor may only be held to have affirmatively placed a plaintiff in a position
6  of danger by virtue of 'omissions and commissions' to the extent that the actor's failure to
7  act is coupled with some sort of affirmative conduct." *J.K. v. Ariz. Bd. of Regents*, No.
8  CV-06-916-PHX-MHM, 2008 WL 4446712, at *6 (D. Ariz. Sept. 30, 2008).

9        This Court previously dismissed Plaintiffs § 1983 claim against Defendants for
10 lacking specific allegations of Defendants' affirmative actions to operate without sufficient
11 staff and the misclassification of Inmate Read. (*See* Doc. 31 at 8–9.)  The Court also found
12 that Defendants' failure to protect alone did not give rise to an affirmative action under a
13 § 1983 state-created danger exception theory. (*See* Doc. 31 at 8–9.)

14       Plaintiffs now contend that their proposed Second Amended Complaint addresses
15 these deficiencies. (Doc. 73 at 2–3.)  Plaintiffs point to their allegations that had Inmate
16 Read been properly classified, his movement and housing would have been restricted. (*See*
17 *id.* at 24, 28, 36.)  Plaintiffs also note that they now allege that Chaplain Miser had a
18 reasonable expectation that he would not interact with mislabeled and SMI inmates, and a
19 reasonable expectation that Centurion and its staff would appropriately screen, label, and
20 treat such inmates, so that they would not have contact or access to him. (*Id.* at 37.)
21 Defendants respond that these assertions fail for the same reasons the Court rejected
22 previously and arguing an affirmative act must also increase the risk of danger. (*See* Doc.
23 77 at 6–8 (citing *Doe B v. Chandler Unified Sch. Dist.*, No. CV-18-01485-PHX-SRB, 2018
24 WL 8261180, at *2–3 (D. Ariz. Aug. 21, 2018).)

25       Plaintiffs' allegations are essentially a recharacterization of their prior allegations
26 that Defendants failed to act, i.e., an omission.  Here, Plaintiffs posit that Defendants made
27 an affirmative action by assigning Inmate Read an improper classification. (*See* Doc. 81
28 at 9.)  But an affirmative act requires "not only that the defendant acted affirmatively, but

also that the affirmative conduct placed [plaintiffs] in a worse position than that in which [they] would have been had the state not acted at all." *Doe B*, 2018 WL 8261180, at *3 (quoting *Pauluk*, 836 F.3d at 1124). Plaintiffs' allegations lack the latter. As alleged, there is no telling the position Plaintiffs would have been in had Defendants not classified Inmate Read as MH-1 or responded to his emails. Had Defendants not classified him as MH-1 does not mean he would have been MH-3 or that if they did not respond to the emails that the attack would not have happened.

Regarding Plaintiffs' reasonable expectation allegations, they cite *Grubbs*, 974 F.2d at 121. There, the defendant "enhanced [plaintiff's] vulnerability to attack by misrepresenting to her the risks attending her work." *Id.* As the Ninth Circuit later explained, the misrepresentation as to the risk "was an additional and aggravating factor, making [plaintiff] more vulnerable to the danger [defendant] already created." *Kennedy*, 439 F.3d. at 1065. The reasonable expectation in *Grubbs* was based on allegations of representations made to the plaintiff. *See* 974 F.2d at 121–23. Here, Plaintiffs' proposed Second Amended Complaint lacks any such allegations to form the basis for Chaplain Miser's expectations. And even if there were, Plaintiffs inadequately allege an affirmative act in which the representation would add to or serve to aggravate. Therefore, Plaintiff's claim (Count I) under the proposed amendments remains deficient, and the Court will deny leave to amend.

**B. *Monell* Liability**

To state a claim against a private entity under *Monell*, a plaintiff must allege that the entity acted under color of state law, and that the claimed constitutional violation was caused by an official policy or custom of the entity. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).

Plaintiffs proposed amendments allege that Centurion acted under the color of state law on behalf of ADOCRR when it violated their constitutional rights by maintaining and practicing widespread policies and customs, violated the Manual, and disregarded a substantial likelihood that harm would result. (Doc. 73 at 40–41.) Specifically, Centurion

failed to: (1) follow the requirements of the Manual; (2) perform the necessary assessments of inmates within two-days of an inmate's arrival; (3) obtain complete medical and mental health records for inmates; (4) perform an initial medical records review within twelve hours of an inmate's booking; (5) timely and appropriately respond to inmate's health services requests; (6) coordinate mental health care and housing placements; (7) assign an update inmate's mental health scores to accurately reflect his conditions; (8) create and ensure continuity of care for inmates; and (9) ensure adequate staff were available. (*Id.*) Plaintiffs further allege that Centurion failed to train and supervise its agents, employees, and staff, and, in doing so, was deliberately indifferent to the constitutional violations that would not have occurred otherwise. (*Id.* at 33–35, 42–43.)

Defendants lump their opposition to this claim with their arguments related to a lack of affirmative acts discussed above. (Doc. 77 at 8.) However, an affirmative act is not always necessary to establish a *Monell* liability claim. *See, e.g.*, *Inzunza v. Pima County*, No. CV-22-00512-TUC-SHR, 2023 WL 7724881, at *5 (D. Ariz. Nov. 15, 2023) ("In an 'omission' case, a plaintiff must show, in addition to a constitutional violation, that the municipality's policy of inaction 'amounts to deliberate indifference to the plaintiff's constitutional right, and that the policy caused the violation, in the sense that the municipality could have prevented the violation with an appropriate policy.'"); *Hernandez v. City of Chandler*, No. CV-23-01400-PHX-MTL (ESW), 2023 WL 7301860, at *6 (D. Ariz. Nov. 6, 2023) (same). Therefore, Defendants have failed to establish a basis for the Court to find futility of the amendment to this claim. Thus, the Court will grant leave to amend on Plaintiffs' *Monell* liability claims (Count II and III).

**C. Medical Malpractice & Negligence Claims**

First, in addressing an initial matter, Defendants argue that even if the Court were to grant leave to amend the medical malpractice claim, any amendment would be futile based on a res judicata bar. (Doc. 77 at 2 (citing *Montana v. United States*, 440 U.S. 147, 153 (1979); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 962 (9th Cir. 2006)).) Although the Court previously dismissed the state malpractice claim with prejudice, both cases that

Defendant's cite do not address the situation in this case. *See, e.g.*, *Montana*, 440 U.S. at 153 (discussing the application of claim preclusion to claims asserted in a *subsequent* suit already decided in a prior suit); *Leon*, 464 F.3d at 962 (same); *see also In re Exxon Valdez*, No. 3:89-0095-CV-HRH, 2007 WL 9717369, at *10 (D. Alaska July 17, 2007) ("[R]es judicata applies when there are two lawsuits involving the same claim." (emphasis omitted)). Therefore, the Court declines to find futility as argued by Defendants precludes Plaintiffs' amendment.

Turning to the claims, Plaintiffs' state law medical practice claim requires establishing the same four elements as negligence. *Seisinger v. Siebel*, 203 P.3d 483, 492 (Ariz. 2009). To state a claim for negligence one must assert: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages. *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007).

The Court previously dismissed Plaintiffs' state law medical malpractice claim for lack of duty under Arizona law. (Doc. 31 at 11–16.) However, while the Court indicated the current Arizona law at the time of issuing the Order barred Plaintiffs' claim, it left open the potential for a change in the law with the Arizona Supreme Court granting review on *Avitia v. Crisis Preparation and Recovery Inc.* (*Avitia I*), 521 P.3d 373 (Ariz. Ct. App. 2022). (*Id.* at 17.) Under the prior Arizona law, this Court found Plaintiffs' claim failed because their theory relied on establishing a duty based on foreseeability, which the common law did not recognize. (Doc. 31 at 16–17 (discussing *Avitia I*, 521 P.3d at 381).)

Plaintiffs now contend that the Arizona Supreme Court's holding in *Avitia v. Crisis Preparation & Recovery Inc.* (*Avitia II*), 536 P.3d 776 (2023), marked a change in the law sufficient to establish duty under the facts of this case. (Doc. 73 at 4–7.) Plaintiffs further assert that they discovered new facts about Inmate Read's medical records to support that a duty existed. (*Id.*) Defendants argue that Plaintiffs' claim remains vaguely and fatally premised on foreseeability. (Doc. 77 at 2–4 (citing *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 829 (Ariz. 2018).) Plaintiffs concede that their theory does not rely on foreseeability, rather

they argue that *Avitia II* recognized mental health professionals could owe a duty to third parties to protect them from harms caused by patients under their care without regard to foreseeability and as indicated in Restatement (Third) of Torts, § 41(a), (b) (Am. L. Inst. 2012). (Doc. 81 at 3–4.)

Plaintiff ultimately bears the burden to establish a duty exists. *Avitia II*, 536 P.3d at 782. "Whether a duty exists 'is a legal matter to be determined before the case-specific facts are considered.'" *Quiroz*, 416 P.3d at 828 (quoting *Gipson*, 150 P.3d at 232). Aside from statutory duties, Arizona courts generally recognize that a common law duty may be found in parts of the Restatement, unless it conflicts with Arizona law. *Avitia II*, 536 P.3d at 785. The Arizona Supreme Court held that "a limited duty of mental health professionals to third parties exists in certain circumstances under statute and common law." *Id.* This begs the question—what are those circumstances? The Arizona Supreme Court's jurisprudence has not been a paragon of clarity.

The Arizona Supreme Court recognized that "[a]n actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of that relationship," and special relationships include "a mental-health professional with patients." *Id.* (quoting Restatement (Third) of Torts, § 41(a), (b)(4)); *see also Dinsmoor v. City of Phoenix*, 492 P.3d 313, 319 (Ariz. 2021) (holding that a duty arises only where a "known and tangible risk of harm" exists within the special relationship). The court further clarified "[it] do[es] not speculate which, if any, of these Restatement sections apply . . . , and admonish[es] that they must be read in a way that does not inject foreseeability into the duty framework and in concert with statutes addressing the subject matter." *Avitia II*, 536 P.3d at 785.

Plaintiffs fail to identify the legal duty owed by any of the named Defendants. "[T]he existence of a duty is not to be confused with details of the standard of conduct." *Quiroz*, 416 P.3d at 841 (quoting *Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 367 (1985)); *see also Markowitz*, 706 P.2d at 367 (explaining "details of conduct bear upon the issue of whether the defendant who does have a duty has breached the applicable standard of care

and not whether such a standard of care exists in the first instance."). Plaintiffs inappropriately invite the Court to consider the facts of the case as part of its duty analysis.

The law Plaintiffs cite as providing for a duty is unavailing. Plaintiffs cite to *Avitia II* and *Dinsmoor* for the proposition that a duty arises where a "known and tangible risk of harm" exists within the special relationship. (Doc. 73 at 6.); *Avitia II*, 536 P.3d at 785 (quoting *Dinsmoor*, 492 P.3d at 319). The *Avitia II* court avoided speculating as to what common law duty the mental health professional owed to third parties arising out of a special relationship with a patient, with the caveat that a "limited" one exists under "certain circumstances." *See* 536 P.3d at 784–85 (holding there were no grounds to establish a common law duty to warn third parties). And *Dinsmoor* addressed the special relationship between a school and a student. *See* 492 P.3d 319.[2] Neither case articulates an applicable legal duty owed here.

Plaintiffs' reliance on the Restatement is also misplaced. Restatement (Third) of Torts, § 41(a) recognizes a "[a]n actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of that relationship." But using this language to define a duty without further development injects foreseeability into the duty analysis. *See, e.g.*, *Avitia II*, 536 P.3d at 783–85 (rejecting using a distinction between "scope" of a duty and foreseeability to define the existence of a duty). Plaintiffs' arguments are essentially that Defendants' relationship gave rise to a duty to protect third parties, including Chaplain Miser, based on perceived risks and potential harms stemming from that risk. Defining a duty in such a way invites foreseeability as it necessarily relies on predictability or would improperly require the Court to consider the facts of the case before making the legal determination that a duty exists in the first place.

Plaintiffs failed to rebut Defendants' futility argument that no Defendant owed a

---

[2] Plaintiffs also cite Arizona Revised Statute § 31-226.1(A) as providing support for imposing a duty of reasonable care on mental health professionals, but this Court previously rejected reading that statute, and related statutes, as granting a duty to third parties. (Doc. 31 at 13.) Plaintiffs essentially ask for the Court to create a legal duty where it cannot conclude one exists from the authority Plaintiffs provide.

legal duty to third parties.³ Therefore, Plaintiffs have failed to articulate the basis for finding that the Defendants under any negligence theory owed a legal duty to third parties, including Chaplain Miser. Because this is an issue of Plaintiffs' failure to show a legal duty exists in the first place, any amendment to the Complaint would be futile.⁴ Thus, the Court will deny leave to amend the negligence-based claims (Counts V and IV).

## IV. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED granting in part** Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. 73) relating to the *Monell* liability claims (Counts II and III) only and **denying in part** for the remaining claims.

**IT IS FURTHER ORDERED** Plaintiffs must file their Second Amended Complaint within **10 days** of this Order.

Dated this 7th day of January, 2025.

*[signature]*
Honorable Susan M. Brnovich
United States District Judge

---

³ Additionally, even if the Court found a duty, Plaintiff fails to rebut Defendants' assertions that Defendant Zephier, Tuttle, Borden, Kasimoff, Monroe, and Buckner are not mental health professionals and owe no duty under a special relationship. Therefore, there is no basis to find a duty owed by these Defendants to a third party here.

⁴ Defendants further argue that Plaintiffs cannot now add Defendants Zephier, Tuttle, Ortega, Borden, Amanwanna, Kasimoff, Monroe, Buckner, and Delaney because the statute of limitations has run. (Doc. 77.) Because the Court finds futility of the amended claims as to these Defendants, the Court need not reach the issue.